THE ARKANSAS CITY BANK v. SWIFT & COMPANY.
No. 8912.

1. COMMON LAW — *contrary not shown, presumed to prevail in Indian Territory.* Since the act of Congress of March 1, 1889, establishing a court for the Indian Territory which administers the common law in the absence of proof of any other, this Court will also presume that system to be in force there when there is no showing to the contrary.

2. ———— *rule stated as to chattel mortgage without possession.* The rule of the common law is that a mortgage of personal property unaccompanied by possession, is *prima facie* void as to creditors and subsequent purchasers and mortgagees in good faith; yet the presumption of fraud arising from continued possession of the mortgagor may be rebutted by explanations showing the transaction to be fair and honest, and giving a reasonable account of the retention of possession.

3. EVIDENCE EXAMINED — *in chattel mortgage case.* The evidence examined and *held*, that the chattel mortgage was not strengthened by the absolute bills of sale upon the same property; but *further held*, that there was some evidence of possession by the plaintiff in error for the consideration of the jury.

*Error from Wyandotte Court of Common Pleas.*
*Hon. T. P. Anderson, Judge.*

REVERSED AND REMANDED.    OPINION FILED DECEMBER 5, 1896.

THE original action was commenced by the Arkansas City Bank against Swift & Company, December 13, 1890, to recover the sum of $6,000 as damages for the wrongful conversion of 229 head of cattle. On October 12, 1892, the Court, having heard the evidence on behalf of the plaintiff, sustained a demurrer thereto and rendered judgment in favor of the defendant. A new trial being refused the plaintiff prosecutes its petition in error to this Court.

The evidence tended to show the following facts: Warren & Irby, of Weatherford, Texas, owned a herd of about 1,230 cattle which, in the winter of 1888 and

1889, they brought to that part of the Cherokee Strip known as the Kaw Indian Reservation, a few miles south of Arkansas City, for pasturage and feeding. The cattle were placed in an inclosure called "The Oil Pasture." In August, 1889, Irby, who was in charge of the cattle, employed J. P. Holloway to find a purchaser. Beach & Feagans owned a ranch on the reservation not far away. They were brought into communication with Irby through Holloway, and they agreed to purchase 1,000 head at $20.50 each, and they paid $1,000 thereon which they borrowed from the First National Bank in Arkansas City. The cattle so contracted for were then branded with a D, which was the ranch brand of Beach & Feagans, but the cattle remained in The Oil Pasture. After considerable effort Beach & Feagans failed to obtain the necessary money to complete the purchase, and they so notified Irby and told him that he was welcome to the $1,000 which had been paid. In their efforts to borrow the money, of which Irby had knowledge, they offered to certain banks security not only upon the cattle to be purchased but also upon 300 head of cattle, 300 head of hogs, 400 tons of millet, 1,500 tons of prairie hay and 200 acres of corn which they owned on their ranch. Irby then proposed that, if Beach & Feagans would take the remainder of their cattle, then numbering 225, at $15 per head, in addition to the 1,000 at $20.50 per head, and would give them the same security they had offered in negotiations with the banks, the firm of Warren & Irby would carry the paper for eight months. This proposition was accepted, and the cattle were driven to the ranch of Beach & Feagans. The parties then went to Arkansas City to have the papers drawn up. Going into the Arkansas City

Bank on October 22, 1889, where the transaction was explained to the president and the cashier, it was arranged that the Bank should take and discount the paper, and instruments were drawn up as follows : Four promissory notes of $5,000 each and one for $6,040 payable to the order of Warren & Irby, each due in eight months with 10 per cent. interest after maturity, a chattel mortgage from Beach & Feagans to Warren & Irby to secure said indebtedness on all the cattle, hogs and feed above described, including the Warren & Irby cattle on Beach & Feagans's ranch on the Kaw Reservation in the Indian Territory, an absolute bill of sale from Warren & Irby to J. H. Hartman, cashier, for the 1,225 head of cattle, and another absolute bill of sale from Beach & Feagans to J. H. Hartman, cashier, for all the property described in the chattel mortgage. The notes were drawn to include interest for eight months at 12 per cent. per annum on the purchase price of the cattle, which was to be treated as a discount on the purchase of the notes from Warren & Irby who indorsed the same. Before any money was paid, however, James L. Britton, the president of the Bank, went with the parties to the ranch of Beach & Feagans, where he saw the cattle and accepted them as satisfactory. After his return the purchase-price of the 1,225 head of cattle was paid to Irby for his firm, less $1,000 to be paid to the First National Bank for Beach & Feagans ; it being agreed that said indebtedness of Beach & Feagans to the Bank should be a part of the purchase-money. Notwithstanding the execution of said absolute bills of · sale, it was the understanding of all parties that, when the notes should be fully paid, the remainder of the property or of the proceeds thereof should belong

to Beach & Feagans.   The cattle and the hogs re-
mained on the ranch, the Bank and Warren & Irby at
different times having men to inform them with ref-
erence thereto ; Warren & Irby being anxious to pro-
tect their indorsement of the notes.   The chattel.
mortgage was filed and entered in the office of the
Register of Deeds of Cowley County, Kansas, Febru-
ary 26, 1890, but it does not appear that any renewal
affidavit was ever filed.   On June 28, 1890, Britton
shipped to Kansas City and sold some of the cattle,
and in July, August and September other shipments
were made, the cattle in all numbering about 826
head, the net proceeds thereof being $17,295.99.
Britton supervised these shipments personally for
the Bank.   About November 1, the officers of the
Bank informed Beach that they would send a man
named Beeks down there to represent them, to gather
in the cattle, feed them, and see that everything was
ready so that the cattle might be shipped from the
5th to the 10th of December.   On November 12 Hart-
man, the cashier, went to the ranch in company with
Beeks, and they met both Beach and Feagans, who
were informed by Hartman that Beeks was a good
man, capable of doing anything, and that he would
help to gather in the cattle and feed them.   Hart-
man then counted the cattle in the pasture, the num-
ber being about 391.   He remained over night at
the ranch and returned to Arkansas City the next
day.   Beeks assisted other men in the employ of
Beach & Feagans in rounding up the cattle that were
out on the range, and also in feeding those in the pas-
ture, Beach & Feagans giving him and the other men
directions what to do.   The cattle brought in from
the range each evening were turned into the pasture
with the others.   On Sunday morning, November 23,

10 car-loads of these cattle were shipped in the name of D. McDowell from a station on the A. T. & S. F. Railroad. Feagans was present at the time of the shipment. Beeks testified that he did not know that the cattle were taken out of the pasture until about a week afterward. McDowell went with the cattle to Kansas City, where he was known as a shipper, and there he employed C. H. Means, a commission merchant, to sell them on November 24, and on that day Means sold in open market to Swift & Company 228 head of the cattle at $2.45 per hundred, that being the market price and the net proceeds being $4,955.12; and he sold the remaining 21 head to other parties. The evidence does not disclose what became of the remainder of the cattle the hogs and the feed not included in the several shipments by the Bank and by McDowell, but the Bank received nothing except from its several shipments; and C. H. Means, the commission merchant, and Swift & Company as purchasers, acted in entire good faith and without any knowledge of the claim of the Bank upon the cattle; and those sold to Swift & Company were of the Warren & Irby herd.

The plaintiff introduced in evidence the act of the Legislature of Missouri Territory, approved January 19, 1816, entitled "An Act Declaring what Laws shall be in Force in this Country," showing the adoption of the common law of England as the rule of action and decision in the Territory, as far as applicable, and when not repugnant to, or inconsistent with, the statutes of the Territory, etc. The plaintiff also offered in evidence certain decisions of the Federal courts, and the act of Congress of March 1, 1889, establishing a court in the Indian Territory.

Opinion of the Court.

*Hutchings & Keplinger*, and *R. E. Ball*, for plaintiff in error.

*Warner, Dean, Gibson & McLeod*, for defendants in error.

MARTIN, C. J.   I.   What code or system of laws must furnish a rule of decision as between these parties as to this property, is the first question suggested.   The Territory of Missouri was carved out of the vast expanse known as Louisiana, which was ceded to the United States by France in 1803 and which had been alternately under the sovereignty of France and Spain. The country known as the Indian Territory and Oklahoma was part of the Missouri Territory, and there-

1. Common law presumed to prevail.

fore the common law was extended over it in 1816 by the act of the territorial Legislature, and so the former laws, whether of France or Spain, were abrogated.   It may be that when the State of Missouri was admitted into the Union with its western boundary extending only as far as "a meridian line passing through the middle of the mouth of the Kansas River where the same empties into the Missouri," the territorial laws ceased to operate in the outlying region west of that meridian (*St. Louis & S. F. Rly. Co. v. O'Loughlin*, 49 Fed. Rep. 440) ; but this is not entirely clear.   *O'Ferrall v. Simplot*, 4 Iowa, 381, 399, 400.   However this may be, the act of Congress of March 1, 1889, established a court for the Indian Territory having jurisdiction in all civil cases between citizens of the United States, residents of the Indian Territory, or between citizens of the United States or of any state or territory therein and any citizen of or person or persons residing or found in the Indian Territory, when the value of the thing in controversy or

30—57 KAN.

damages or money claimed should amount to $100 or more ; the code of procedure to conform as near as might be to that existing in the State of Arkansas (25 U. S. Stat. at Large, 783) ; and in *Pyeatt v. Powell,* 51 Fed. Rep. 551, it was held that in an action in the federal court established by that act the rule of decision, in the absence of statute, or of proof of the laws, rules or customs prevailing in the Territory, is the common law.   It is true that the court says the *lex fori* is applicable, and that in the Federal courts, in the absence of statutes repealing or modifying it, the common law is the rule of decision and guide of action ; and from this the learned counsel for the defendant argue that a Kansas court should presume, in the absence of proof to the contrary, that the law of the place where these cattle were kept was the same as our own, and that the court below was justified in applying the law of the forum.   This position cannot be maintained.   In this State the rights of a chattel mortgagee not in possession, as to subsequent purchasers and mortgagees in good faith, depend upon our statute, which makes registration a necessity. But we must take judicial notice of the fact that no such statute could have existed in the Indian Territory when this transaction took place, for no legislative body, except Congress, existed having any control in that region from the admission of Missouri into the Union in 1820 until the Organic Act of Oklahoma Territory which took effect May 2, 1890.   26 U. S. Stat. at Large, 81.   In saying this we do not take into account the acts and doings of the legislative bodies organized or constituted by the Indians to prescribe rules for their own government, for these do not extend to citizens of the United States having no relation to the several tribes.   There could be no registry act as to

chattel mortgages in a country having no legislative body ; and we think that since the act of Congress of March 1, 1889, establishing for the Indian Territory a court which administers the common law, it is the duty of this Court, when there is no showing to the contrary, to recognize that system as in force there. In *McKennon v. Winn*, 1 Ok. 327, the Supreme Court of Oklahoma decided that the common law prevailed in that Territory at the time of its first settlement, April 22, 1889, and until the adoption of its Organic Act.    See also, *First National Bank v. Kinner*, 1 Utah, 100, 106, 107 ; *Thomas v. The U. P. R. R. Co.*, 1 id. 232, 234 ; *Thompson v. Rainwater*, 49 Fed. Rep. 406.

II.  In *Pyeatt v. Powell*, supra, Judge SANBORN, delivering the opinion of the United States Circuit Court of Appeals, thus succinctly states the principle that must control this case upon this point :

"The rule of the common law is that a mortgage of personal property, unaccompanied with possession, is *prima facie* void as to creditors of the mortgagor ; yet the presumption of fraud arising from that circumstance may be rebutted by explanations showing the transaction to be fair and honest, and giving a reasonable account of the retention of possession."

And it was accordingly held that a chattel mortgage executed in good faith at Coffeyville, Kansas, July 18, 1888, upon certain mares and colts in the Indian Territory, was valid notwithstanding the mortgagor retained possession and the mortgage was not recorded anywhere ; and the rule so stated and its application in that case are well supported by the authorities therein cited and by others.    The same rule applies to subsequent purchasers and mortgagees as to creditors.    The evidence in this case tended to show that the transaction be-

2. Common law rule as to chattel mortgages.

tween the Bank and the firms of Beach & Feagans and Warren & Irby was fair and honest; and it was error for the Court to take the case from the jury, since our registry act is inapplicable to chattels owned and held in other states and territories where the common law prevails.

III.   The chattel mortgage was not strengthened by the absolute bills of sale upon the same property; because it was fully understood that the transfer was intended only as a security for the indebtedness of Beach & Feagans, and that whatever surplus should remain of the mortgaged property or of the proceeds of the same after the satisfaction of the indebtedness should belong to them, and therefore the papers taken together constituted only a chattel mortgage.   We think, however, that there was some evidence tending to show the possession of the cattle by the Bank, and that the Court erred in taking that question from the jury.

The judgment will therefore be reversed, and the case remanded for a new trial.

All the Justices concurring.